**Opinion issued May 13, 2014**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-13-00112-CR**

———————————

**ANTHONY AGADO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Case No. 1236042**

---

**MEMORANDUM OPINION**

A jury found appellant, Anthony Agado, guilty of the offense of aggravated robbery.[1] After appellant pleaded true to the allegations in an enhancement paragraph that he had been previously convicted of the felony offense of delivery

---

[1]   *See* TEX. PENAL CODE ANN. § 29.03(a)(2) (Vernon 2011).

of a controlled substance, the trial court sentenced him to confinement for forty years. In one issue, appellant contends that he received ineffective assistance of counsel at trial when his counsel did not attempt to suppress certain identification testimony and did not request a jury instruction regarding mistaken identification and "impermissibly suggestive identification procedure testimony."

We affirm.

## Background

The complainant, Yolanda Gutierrez, testified that on September 26, 2009, she was living in a house with her son, Caesar, and several grandsons. They lived next door to her brother, Amancio Solis, and his wife, Elsa. That afternoon, Amancio, the complainant's nephew, Raoul, and the complainant's brother, Horace, came over to her house. The complainant explained that her other son, Brian Gutierrez, had just returned home with her grandson, Juan Gutierrez. As Amancio opened the back door to leave to retrieve a measuring tape from his house, he found a tall man, wearing a black ski mask and holding an assault rifle, coming in the door. Amancio complied with the man's order to get on the floor. The complainant identified appellant as one of two other men, both of whom carried handguns, who followed the tall, masked man into her house. After the three men forced her onto the dining room floor with Amancio, Juan, Horace, and Raoul, the masked man used cable ties to restrain everyone but the complainant.

2

Appellant then demanded that Juan tell him the location of money and narcotics. The complainant noted that appellant appeared to be the "guy in charge," and he kicked and pistol-whipped Juan when he said that he did not know the location of money or narcotics. Appellant repeatedly said, "You know where it is." After appellant found a safe in the complainant's bedroom closet, he threw it onto the floor in front of her and ordered her to open the safe. However, she was unable to do so because she was afraid and could not remember the combination; she told appellant to take the safe with him. Appellant then told the masked man to bind the complainant, but a fourth man from outside opened the door and told them that they needed to leave. The men then left the house, and the complainant heard a loud bang as they threw the safe into the back of a pickup truck.

On October 7, 2009, a Houston Police Department ("HPD") detective met with the complainant, showed her a photographic array of six men, and she identified appellant as one of the assailants and signed and dated his photograph. The complainant explained that she recognized appellant because she had seen his face in her house. She also positively identified appellant in court as one of the assailants.

Brandon Gutierrez, the complainant's grandson, testified that on September 26, 2009, he was playing video games with his friends, Jose Martinez and Adrian Tomez, in a small one-room "house" behind the complainant's house. Jose told

3

Brandon that he saw a man pointing a gun at his uncle's head. Brandon looked up to see three men push his uncle, Brian Gutierrez, and his cousin, Juan Gutierrez, into the complainant's house. Brandon wrote down the license plate number of a gray Dodge pickup truck that was in the driveway. The boys ran out of the house, but were caught in the yard by another man carrying a gun and wearing a ski mask. The man also stopped Brandon's aunt, Elsa Solis, who had come outside to lock the gate to her yard, and he ordered them all to get down onto the ground. He then pointed his gun at Brandon, kicked him, and demanded that Brandon tell him the location of "the money." A short time later, Brandon saw the men who had gone inside the complainant's home throw the safe into the back of the pickup truck and drive away. After they left, Brandon ran into the complainant's house and found his family lying on the floor. He used a knife to cut the zip ties that bound their hands.

Juan Gutierrez, the complainant's grandson, testified that he had just arrived home with his uncle, Brian Gutierrez. Brian went ahead of Juan into the house when a Dodge pickup truck pulled up. Three men got out of the truck, and one came up behind Juan with a gun and took him into the house. Once inside, the men told Juan to get onto the floor, tied his hands with zip ties, and began demanding the location of "the money." One of the men hit Juan on the head with a handgun when he told them that he did not know the location of "the money."

Juan saw his uncles, Amancio and Horace, lying on the floor near him, and he heard the complainant crying.

Jose Martinez testified that on September 26, 2009, he was playing video games and drinking beer with Brandon and a friend at the complainant's house. Jose saw Brian and Juan Gutierrez pull up to the house before some men came up behind them and forced them into the complainant's house. Jose told Brandon that they needed to leave, but when they went outside, a man with a gun stopped them, made them stay on the ground, and hit Brandon when he looked up at the pickup truck. Jose noted that the man also made Brandon's aunt, Elsa Solis, get onto the ground with them. He later saw the men leave the house and throw a safe into the back of a pickup truck. On October 9, 2009, a HPD officer came to Jose's house, showed him a photographic array of six men, and Jose identified appellant as the man that he saw without a mask. He then put the date and his initials next to appellant's photograph.

Brian Gutierrez, the complainant's son, testified that on September 26, 2009, he went into the complainant's house after returning there with his nephew Juan Gutierrez. When Brian walked back from his nephew's room, a man put a gun to his back and told him to get onto the floor. After the man dragged Brian to the kitchen and dining room area, he tied his hands with zip ties. Brian explained that he was placed near his uncles and cousin who were already being tied up. One

5

of the assailants began ransacking the house while a man without a mask began talking to the complainant. Brian identified appellant as the man, noting that he stood only about ten feet away and held a Ruger pistol. Brian explained that appellant asked the complainant for the location of "the money" and narcotics. The complainant was afraid and begged for her life. Brian saw his nephew, Juan, on the floor with him, bleeding because appellant had hit him on the head with a handgun. Brian kept his head up, but one of the men kicked him because he was looking around. When the men found the safe, they brought it out and tried to get the complainant to open it, but she was unable to do so because she was afraid. The men left after someone else poked his head into the doorway and said that they needed to leave. Brian further testified that when a HPD officer showed him a photographic array of six men, he immediately identified appellant as the unmasked man who had held a gun to the complainant's back.

Amancio Solis, the complainant's brother, testified that on September 26, 2009, the complainant asked him to come next door to take measurements for some shelves. As Solis was walking out the back door of the complainant's house, he was met by a masked man coming in the door. The man shoved him, told him to lie down on the floor, and then tied him up. Solis noted that the man forced his brothers, Horatio and Raoul, to lie on the floor near him with their hands tied. Solis explained that he stayed face down on the floor with his hands tied behind his

6

back. Another man then came in, and Solis heard the men hitting his nephew, Juan, and asking him, "Where's the money?" and "Where is the dope?" Solis noted that the men took his wallet, cellular telephone, and knife.

Elsa Solis, Amancio's wife, testified that on September 26, 2009, she was in her living room watching television when she heard motor vehicles and doors slamming. When she went to her front window to see what was happening, she saw a motor vehicle and a man wearing a ski mask and holding a gun. Looking out another window, she saw her nephew, Brandon, sitting on the ground with his head down. When Elsa ran outside to lock her gate, the man with the gun saw her and ordered her to come over to him in the complainant's yard. She kept her head down until she heard a loud noise, and then the men left. Elsa explained that she then ran into the house and immediately telephoned for emergency assistance.

HPD Officer H. Castro testified that on September 26, 2009, he and his partner, Officer Knockart, were dispatched to an attempted robbery. Brandon told Castro that the men had used two motor vehicles in the robbery: (1) a Dodge pickup truck and (2) a Chevrolet Suburban. He also noted that he had obtained one license plate number. Castro explained that in the complainant's home he found zip ties in the dining room and 63 grams of marijuana with a scale in the bathroom.

HPD Officer J. Varela testified that on September 28, 2009, he was assigned to conduct a follow-up investigation of the robbery at the complainant's home.

Varela explained that from the license plate number recorded by Brandon, he located the registered owner of the pickup truck that was used in the robbery. And he obtained the name of a man who drove the truck. Varela noted that although the truck was not registered in appellant's name, he was "connected to" the registration on the truck. Varela then obtained descriptions of the robbery suspects, and he compiled a photographic array, which contained pictures of six men of the same ethnicity with similar physical characteristics. Varela met with the complainant where she worked and showed her the array. He noted that she immediately and without hesitation identified appellant as the "person who robbed [her]," and she circled the photograph, signed, and dated it. Varela thanked the complainant, but he gave her no acknowledgement concerning the individual that she chose from the array. He also met with Jose Martinez at his home and showed him the photographic array. Martinez also identified appellant as one of the individuals involved in the robbery, and he also circled the photograph, signed, and dated it. Finally, Varela met with Brian Gutierrez, who also identified appellant as an assailant from the photographic array.

**Standard of Review**

To prove a claim of ineffective assistance of counsel, appellant must show that (1) his counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A reasonable probability is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that his performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006) (quoting *Strickland*, 466 U.S. at 688–90, 104 S. Ct. at 2065–66); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Appellant has the burden to establish both prongs by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

## Ineffective Assistance of Counsel

In one issue, appellant argues that his trial counsel rendered ineffective assistance because she did not move to suppress or request a suppression hearing regarding the "impermissibly suggestive" pretrial and trial identifications. He further asserts that trial counsel erroneously did not request a jury instruction

regarding "mistaken identification and impermissibly suggestive identification procedure testimony."

### *Motion to Suppress*

Appellant first asserts that the statutory requirement that Texas law enforcement agencies adopt and implement a detailed written policy regarding photograph and live line-up procedures had been in place for almost five months at the time of his trial, giving his trial counsel "sufficient time to adequately cross-examine the officers about the prior deficiencies in Houston's identification procedures." Appellant also asserts that the "issues of impermissibly suggestive identifications and motions to suppress those identifications" are "routinely used in defense practice." However, appellant concedes that these new guidelines "aren't grounds for automatic suppression," but should instead "be a factor counsel argues in a suppression motion and hearing and to the jury."

In order to meet the first prong of *Strickland*, appellant must prove by a preponderance of the evidence that the trial court would have erred in denying the motion to suppress or overruling the objection, had either been made by trial counsel. *See Delgado v. State*, 01-07-00471-CR, 2008 WL 920490, at *3 (Tex. App.—Houston [1st Dist.] Apr. 3, 2008, no pet.) (mem. op., not designated for publication) (citing *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998)).

As of September 1, 2012, Texas law enforcement agencies must adopt and implement a "detailed written policy" regarding the administration of photograph and live line-up identification procedures. TEX. CODE CRIM. PROC. ANN. art. 38.20 § 3; cmt. (c) (Vernon Supp. 2013). However, Article 38.20 expressly states that the failure by a law enforcement agency to conduct a photograph identification procedure in compliance with the statute "does not bar the admission of eyewitness identification testimony in the courts of this state." *Id.*, art. 38.20 § 5(b). Therefore, had appellant's trial counsel moved for suppression of the eyewitness identification testimony on this basis, the trial court would not have erred in overruling the motion. Thus, Article 38.20 would not have impacted any motion to suppress filed by appellant's counsel.

Moreover, nothing in the record suggests that the witnesses' identifications of appellant were tainted such that the trial court would have erred in overruling any motion to suppress on this basis. "An in-court identification is inadmissible when it has been tainted by an impermissibly-suggestive pretrial photographic identification." *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). For the photographic identification to have been tainted, the procedure must have been "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968)). If, from the totality of the circumstances,

there are no indicia of a substantial likelihood of misidentification despite a suggestive pretrial procedure, subsequent identification testimony is deemed reliable. *Id.* (quoting *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988)). In determining reliability under the totality of the circumstances, courts consider the following factors: (1) the opportunity of the witness to view the person at the time of the alleged offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the person; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972)).

Here, three witnesses saw appellant while he was unmasked, communicated with them, and had physical contact with them. Each one identified him individually by his photograph in a photographic array. Several witnesses identified the gray Dodge pickup truck with which appellant was associated as the one used in the commission of the robbery, with Brandon Gutierrez documenting the license plate number. Moreover, the complainant and Brian Gutierrez identified appellant at trial as the unmasked man inside the house during the robbery. In light of these circumstances, the trial court would not have erred in allowing the identification testimony over trial counsel's motion to suppress or objection, where it would not appear substantially likely that these three witnesses

had misidentified appellant, a vehicle with which he was associated, and its license plate number.

Because the trial court would not have erred in denying a motion to suppress the witnesses' identification, we cannot conclude that appellant was denied his constitutional right to a fair trial on this ground. *See Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064; *Jackson*, 973 S.W.2d at 957 (holding that trial counsel is only ineffective in failing to object to evidence if trial court would have erred in allowing its admission); *see also Ibarra*, 11 S.W.3d at 195 (holding that identification testimony is still admissible notwithstanding impermissibly suggestive pretrial identification procedure if, when viewing totality of circumstances, there is not substantial likelihood of misidentification).

We hold that appellant has not demonstrated that his trial counsel's performance in not seeking to suppress the eyewitness identification fell below an objective standard of reasonableness. Accordingly, we hold that appellant has not satisfied *Strickland's* first prong. *See Tong v. State*, 25 S.W.3d 707, 713–14 (Tex. Crim. App. 2000).

### *Jury Instruction*

Appellant next asserts that trial counsel was ineffective in not objecting to the jury charge or requesting a jury instruction on the potential for eyewitness misidentification. In support of his assertion, appellant relies upon the recent

13

United States Supreme Court opinion in *Perry v. New Hampshire*, 132 S. Ct. 716, 728–29 (2012) (noting many federal and state courts have adopted "eyewitness-specific jury instructions"). Appellant requests that we adopt the New Jersey pattern jury charge implemented in "identification-issue cases."

However, the Supreme Court did not mandate such an instruction in *Perry*, and Texas courts have declined to allow jury instructions on mistaken identity, concluding that such instructions constitute improper comments on the weight of the evidence. *See id.*; *Roberson v. State*, 852 S.W.2d 508, 511 (Tex. Crim. App. 1993) (holding that special instruction on mistaken identity would constitute improper comment on weight of evidence); *St. Luce v. State*, No. 14-98-01316-CR, 2000 WL 1862843, at *1 (Tex. App.—Houston [14th Dist.] Dec. 21, 2000, pet. ref'd) (not designated for publication); *see also* TEX. CODE CRIM. PROC. ANN. Art. 36.14 (Vernon 2007) (governing jury charges in criminal cases, commanding that jury charge should not express any opinion on weight of evidence). Furthermore, "requesting a jury instruction to which one is not legally entitled, merely for the sake of making the request, is not the benchmark for a competent attorney." *Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005). Thus, we cannot conclude that appellant's trial counsel was ineffective in not performing "a useless or futile act, such as requesting a jury instruction to which [appellant was] not legally entitled." *Id.*

We hold that appellant has not demonstrated that his trial counsel's performance in not objecting to the jury charge, or requesting a jury instruction on the potential for eyewitness misidentification, fell below an objective standard of reasonableness. Accordingly, we hold that appellant has not satisfied *Strickland's* first prong. *See Tong*, 25 S.W.3d at 713–14.

In sum, we hold that appellant has failed to show, by a preponderance of the evidence, that he received ineffective assistance of counsel at trial. *See Strickland*, 466 U.S. at 687-88, 694, 104 S. Ct. at 2064, 2068; *see also Young v. State*, 991 S.W.2d 835, 839 (Tex. Crim. App. 1999) (holding that first prong of *Strickland* was not satisfied when counsel did not request instruction on necessity because defendant was not entitled to the defense).

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Do not publish. TEX. R. APP. P. 47.2(b).